# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01222-COA

**DAVID THOMAS JORDAN A/K/A DAVID JORDAN A/K/A DAVID T. JORDAN A/K/A DAVID MICHAEL JORDAN**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/25/2023 |
| TRIAL JUDGE: | HON. RANDI PERESICH MUELLER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/11/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1. Law enforcement responded to a call about an intoxicated man wandering in Biloxi. During the arrest, the man told police he had stabbed a man to death. Police eventually found the body of his victim, and expert medical testimony later established that he had been stabbed 29 times.

¶2. The man was indicted for first-degree murder and found guilty by a jury. He appeals, arguing that the evidence was not sufficient to convict him and that the weight of the evidence did not support the verdict. Finding no error, we affirm.

## BACKGROUND

¶3.     One evening in February 2022, Biloxi police officers "responded to a call in reference to a possible murder[.]"  Officers were dispatched to "a large parking lot," where Sergeant Roderick Wiggins ultimately "made contact" with the suspect and identified him as David Jordan.  Jordan, visibly intoxicated, "was stumbling around . . . almost falling."  Sergeant Wiggins then arrested Jordan for public intoxication.  The sergeant's body camera recorded the entire interaction with Jordan.

¶4.     While arresting Jordan, the sergeant immediately "observed . . . blood on his hands."  Then, on his own volition, Jordan told the sergeant, "I stabbed his a** to death."  Continuing on with his spontaneous statements, Jordan told Sergeant Wiggins, "I killed him, I stabbed him to death."  Jordan then said, "Bout 20-30 times."

¶5.     Jordan further informed the officers on scene that the victim's body was "over there in the woods."  Law enforcement officers then headed toward the wooded area and "found a well-worn path not far from the road."  After following the path, officers "came across a homemade dwelling."  Immediately upon entering the dwelling, officers "could see a body laying on the bed."  The victim was pronounced deceased and was identified as Joseph Houseworth.

¶6.     A "fixed-blade knife" was found nearby on a makeshift desk with "red stains," which appeared "consistent with blood stains."  No other knives were located at the crime scene.  Additionally, "a shotgun was mounted over the hearth" in the dwelling.  But there was no

2

indication that the shotgun had been fired, and officers did not locate any ammunition.

¶7. Jordan was then transported from the parking lot to the police department's booking area, where Sergeant Wiggins completed the booking process. Unsolicited, Jordan yelled, "[T]hat son of a b*tch disrespected me and I killed him," and "[H]e f**ked with the wrong motherf**ker." Then, Jordan asked the sergeant, "[W]hen's the last time you had a murder case?"

¶8. While initially arrested for public intoxication, Jordan was later indicted for first-degree murder.

*The Trial*

¶9. At trial, Sergeant Wiggins's body-cam footage was entered into evidence with no objection. When asked if he observed any signs of injuries to Jordan, Sergeant Wiggins testified, "I did not." The sergeant was further asked about Jordan's demeanor during the booking process, to which he responded that Jordan "was still heavily intoxicated" and "continued to tell me how he had killed someone and stabbed someone to death."

¶10. Dr. Staci Turner, the chief medical examiner at the State Medical Examiner's Office, also testified for the State. She was accepted as an expert in the field of forensic pathology by the trial court. Dr. Turner testified:

> Mr. Houseworth had 29 stab wounds. He had three to his face, four to his neck, 14 in the front of his chest, one in the right side of his chest, one in the left side of his back, two in his abdomen, and four in his right arm.

¶11. The medical examiner explained that the combination of these wounds was

3

catastrophic because "multiple significant organs [were] injured," which included damage to the victim's spine, multiple arteries, and blood in the lungs. Dr. Turner disclosed to the jury that the depth of the victim's stab wounds ranged from two inches to seven inches deep.

¶12.    She also detailed that the victim sustained multiple injuries to the forearm area, which she agreed would be consistent with defensive wounds. The medical examiner explained that defensive wounds occur "when a person is trying to fend off an attack, very often [with] the forearms or hands[.]" She further noted that "if someone is trying to fend off [attacks] those areas get injured." The medical examiner testified that based on her autopsy, the victim's cause of death was multiple stab wounds, and his manner of death was homicide.

¶13.    After the State rested its case-in-chief, the defense moved for a directed verdict "on the basis that no rational juror could find the [Jordan] guilty of first-degree murder." Specifically, the defense argued that the State failed to prove beyond a reasonable doubt that Jordan "went to Mr. Houseworth's residence with the intent to commit a murder or to kill him." However, the defense submitted that should the trial court disagree, this case "is one of second-degree murder and not of first." Accepting "as true all of the evidence that was introduced" in addition to "any reasonable inferences that the jury might be able to draw from that evidence," the trial court denied the motion.

¶14.    Jordan then took the stand in his own defense. Although much of his testimony was nonresponsive or contradictory, he attempted to recharacterize his statements captured on the sergeant's body-cam footage the night of his arrest. The core of Jordan's testimony was that

the victim attacked him and that he only responded in self-defense. Jordan testified that the victim had a "sawed-off shotgun" in his home and that "[h]e picked up . . . and was holding . . . in his left hand." He told the jury that the victim threatened to "shoot me and kill me."

¶15. On cross, Jordan testified that the shotgun the victim had pointed at him was the one positioned on the mantel. When asked who put the gun back on the mantel, Jordan replied, "I was unconscious. I have no idea. There could have been ten people in there having a party as far as I know, but I doubt it."

¶16. Although Jordan admitted he stabbed Houseworth, he testified that he "did not stab him no 20 or 30 times." During cross, Jordan demonstrated multiple times for the jury how he stabbed the victim, but was adamant he only did so "five or six times, maybe." When asked what direction the victim was facing when Jordan stabbed him, Jordan responded, "He wasn't facing me."

¶17. The State then questioned Jordan about a phone call he made to a work colleague after the attack:

> The State: Isn't it true that you told [your work colleague] you just killed a man?
>
> Jordan: I don't remember exactly what I said to him, but, yeah, I'm sure I did. I probably did, yes. That's the reason I called him.
>
> . . . .
>
> The State: Isn't it true that you told [him] you were going to burn this place down because it had the evidence?
>
> Jordan: I don't remember what I said. If he said I said that, then I said

5

it. I considered him a very good friend. I was talking crazy. If he said I said it, I said it[.]

¶18.   At the conclusion of trial, the defense requested that a jury instruction for the lesser-included charge of second-degree murder also be submitted to the jury. The trial court gave the instruction.

¶19.   Ultimately, the jury found Jordan guilty of second-degree murder. He was sentenced to 40 years in the custody of the Mississippi Department of Corrections, with 10 of those years suspended and 30 years to serve, followed by 5 years of post-release supervision. The trial court denied his motion for judgment notwithstanding the verdict or a new trial. Jordan then appealed.

## DISCUSSION

### I.   Sufficient evidence supported Jordan's second-degree murder conviction.

¶20.   On appeal, Jordan argues that the "State failed to present sufficient evidence to convict [him] of second-degree murder" because it failed to "prove that [he] did not act in reasonable self-defense."[1]

¶21.   Challenges to the sufficiency of the evidence warrant a de novo standard of review. *Haymon v. State*, 346 So. 3d 875, 881 (¶14) (Miss. 2022). When reviewing the sufficiency

---

[1] "'The issue of justifiable self-defense presents a question of the weight and credibility of the evidence rather than sufficiency and is to be decided by the jury.'" *Swanagan v. State*, 229 So. 3d 698, 703 (¶22) (Miss. 2017) (quoting *Wade v. State*, 748 So. 2d 771, 774 (¶11) (Miss. 1999)).

of the evidence, "[w]e view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime." *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and emphasis omitted).

¶22.   Mississippi law defines second-degree murder as a killing "done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]"   Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2020).   Importantly, under the second-degree murder statute, a finding of intent to kill is not required. *McCool v. State*, 328 So. 3d 173, 183 (¶39) (Miss. Ct. App. 2021) (citing *Swanagan*, 229 So. 3d at 704 (¶24).

¶23.   Jordan admitted—at trial and in the body-cam footage—that he stabbed Houseworth multiple times.  Indeed, he told the jurors that he even stabbed the victim in the back.  The medical examiner testified that the victim suffered a total of 29 stab wounds, ranging from 2 inches to 7 inches in depth.  She also testified that it was clear the victim had defensive wounds on his forearms.  A rational juror could find that given this testimony alone, Jordan committed "an act eminently dangerous to others and evincing a depraved heart, regardless of human life[.]"  Miss. Code Ann. § 97-3-19(1)(b).

¶24.   Therefore, we find the evidence was sufficient to prove each essential element of second-degree murder beyond a reasonable doubt.

    **II.**    **The verdict was not against the overwhelming weight of the evidence.**

¶25. Jordan also argues that the jury's verdict was against the overwhelming weight of the evidence. Specifically, he argues that because "his testimony at trial established strong evidence of his defense of self-defense[,]" the trial court erred in denying his motion for a new trial.

¶26. "A request for a new trial is a challenge to the weight of the evidence." *Haymon*, 346 So. 3d at 883 (¶23) (citing *Ivory v. State*, 283 So. 3d 108, 117 n.12 (Miss. 2019)). "The trial court's grant or denial of a new trial is reviewed under an abuse of discretion standard, and the evidence is viewed in the light most favorable to the verdict." *Id.* (citing *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017)). "We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Jones v. State*, 390 So. 3d 498, 503 (¶20) (Miss. 2024) (quoting *Whitten v. Cox*, 799 So. 2d 1, 13 (¶26) (Miss. 2000)).

¶27. Despite Jordan's theory of self-defense, much of his testimony and the evidence presented at trial contradicted that theory completely. For instance, while Jordan stated that the victim had threatened him with a shotgun, officers found the gun mounted above the mantel. Not only could Jordan offer no explanation as to how the gun got there, but officers found no ammunition in the surrounding area, and there was no indication that the shotgun had been fired.

¶28. Moreover, when asked about which direction the victim was facing prior to stabbing him, Jordan testified that "[h]e wasn't facing me." In fact, in the body-cam footage Jordan

8

can be heard making multiple statements about why he stabbed Houseworth, namely that "that son of a b\*tch disrespected me and I killed him" and that "he f\*\*ked with the wrong motherf\*\*ker." The jury also heard about Jordan's admission to his work colleague about killing the victim. And when asked whether Jordan told his colleague he was going to burn the victim's home down because it contained evidence, he responded, "If he said I said that, then I said that."

¶29. "'[T]he jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness.'" *Id.* at (¶21) (quoting *Meshell v. State*, 506 So. 2d 989, 992 (Miss. 1987)). And it is the jury who was empowered to accept or reject Jordan's theory of self-defense. They chose to reject it. The jury's verdict was not against the overwhelming weight of the evidence, and the trial court did not abuse its discretion by denying Jordan a new trial.

## CONCLUSION

¶30. For the above reasons, we find sufficient evidence supported Jordan's second-degree murder conviction, and the jury's verdict was not against the overwhelming weight of the evidence. Therefore, Jordan's conviction and sentence are affirmed.

¶31. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**

9